**WYLER SUMMIT PARTNERSHIP, a Partnership, Plaintiff–Appellant,**

v.

**TURNER BROADCASTING SYSTEM, INC., a Georgia Corporation; Turner Entertainment Co., a Georgia Corporation, Defendants–Appellees.**

No. 99–15773.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 3, 2000

Filed Oct. 26, 2000

Amended Dec. 7, 2000

Jonathan R. Bass, and Keith Evans–Orville, Coblentz, Patch, Duffy & Bass, LLP, San Francisco, California, for the plaintiff-appellant.

M. Laurence Popofsky, and Christian E. Mammen, Heller Ehrman White & McAuliffe, San Francisco, California, for the defendants-appellees.

Before: D. W. NELSON, THOMPSON, and TROTT, Circuit Judges.

## ORDER

The opinion filed October 26, 2000, is hereby amended as follows:

The slip opinion at 13486, lines 1–2, after the sentence that reads: "Because waiver is an equitable doctrine, Turner argues, the 'gist' of Wyler Summit's claim is equitable."

[*ADD TWO NEW PARAGRAPHS*]:

Initially, Turner points to some 19th century California cases involving issues of waiver, and argues that because those cases were tried in courts of equity, any time a plaintiff relies on waiver as a basis for relief, the action must be equitable. The problem with Turner's argument is that the cases it identifies sought specific performance, as opposed to money damages. *See Cooper v. Pena,* 21 Cal. 403, 411, 1863 WL 493 (Cal.1863) ("This is an action to *compel* the defendant to convey to the plaintiff a tract of land . . . .") (emphasis added); *Farley v. Vaughn,* 11 Cal. 227, 233, 1858 WL 735 (Cal.1858) ("This was a bill filed for a *specific performance* of a contract for the sale of certain real estate") (emphasis added). Specific performance of a real estate contract unquestionably is an equitable remedy.

The fact that Wyler Summit seeks money damages, as opposed to specific performance, does not, by itself, render its action one at law. But, as stated above, the legal or equitable nature of a cause ·of action is ordinarily determined by the remedy sought. *See Raedeke,* 111 Cal.Rptr. 693, 517 P.2d at 1160. That the plaintiffs in *Farley* and *Pena* sought specific performance of a real estate contract is sufficient to distinguish those cases from the case at bar.

At slip opinion 13486, the first sentence of the first full paragraph, which reads: "Turner's analysis overlooks a critical distinction."

*[CHANGE TO ]*:

"Moreover, Turner's argument overlooks a critical distinction."

At slip opinion 13486, the first line of the second full paragraph, which reads: "Ironically, two cases relied upon by Turner illustrate this distinction."

*[CHANGE TO ]*:

"Ironically, the cases Turner cited in its brief and at oral argument illustrate this distinction."

At slip opinion 13487, at the end of the first full paragraph, after the sentence that reads: "Therefore, C & K Engineering did not sue for breach of contract at all; rather, it sued for equitable relief under the doctrine of promissory estoppel. *See id.*"

*[ADD ]*:

; *see also Jaffe v. Albertson Co.*, 243 Cal.App.2d 592, 53 Cal.Rptr. 25, 30 (Cal.Ct.App.1966) (finding Jaffee's suit to be in equity because complaint alleged breach of contract based on an "oral contract" and an "oral promise"); *Ford v. Palisades Corp.*, 101 Cal. App.2d 491, 225 P.2d 545, 546 (Cal.Ct. App.1950) (finding Ford's suit to be in equity because "[t]he complaint alleged that the period of employment was extended by oral agreement and that the facts which plaintiff claims estop defendant from invoking the statute of frauds").

With these amendments, the petition for rehearing filed November 8, 2000, is DENIED.

## OPINION

TROTT, Circuit Judge:

Wyler Summit Partnership ("Wyler Summit") sued Turner Broadcasting System, Inc. and Turner Entertainment Co. (collectively "Turner") for breach of contract involving the motion picture *Ben Hur*. The district court granted summary judgment in favor of Turner, and Wyler Summit appeals. Wyler Summit contends that the district court improperly granted summary judgment based on the doctrines of constructive receipt, judicial estoppel, and laches. Wyler Summit also argues that a genuine issue of material fact exists as to whether a particular provision of a 1958 contract between film director William Wyler and Metro Goldwyn Mayer ("MGM") was inserted for the sole benefit of Mr. Wyler or for the mutual benefit of both parties. Finally, if remand is warranted, Wyler Summit asks us to remand the case to a different district court judge.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and after reviewing the district court's order *de novo*, we REVERSE and REMAND.

## I

## Factual Background

This case is before us for the second time. *See Wyler Summit Partnership v. Turner Broadcasting Sys.*, 135 F.3d 658 (9th Cir.1998) (*"Wyler I "*). Our previous opinion thoroughly traverses the factual background of this case. Here, we mention only the most relevant facts to the issues now before us.

In 1958, famed film director William Wyler entered into a written contract with MGM to direct *Ben Hur*. For his services, MGM agreed to pay Wyler $350,000 plus a "percentage compensation" equal to three percent of the film's gross receipts in excess of $20 million. Another provision of the contract provided that this "percentage compensation" was to be paid "in annual installments not to exceed the sum of $50,000 in any one year . . . ." (the "installment payment provision").[1]

---

1. The compensation provision of the 1958 contract (¶ 3) states, in pertinent part:

[W]e agree to pay you as compensation in full therefor and for all rights herein grant-

*Ben Hur* has been an extraordinary success with critics and at the box office. In addition to garnering more Academy Awards than any other film in history, *Ben Hur* has earned in excess of $131 million in gross receipts as of January 31, 1995. *See Wyler I,* 135 F.3d at 660 n. 2. Thus, based on the formula set in the contract, *Ben Hur* has generated approximately $3.3 million in "percentage compensation" for Mr. Wyler and his successor-in-interest, Wyler Summit. Consistent with the terms of the contract, MGM and its successor-in-interest, Turner, have paid $1.8 million in annual $50,000 installments to Mr. Wyler and Wyler Summit. Consequently, Turner retains $1.5 million in accrued but unpaid percentage compensation.

In 1995, Wyler Summit attempted to waive the installment payment provision and demanded that Turner immediately pay the entire $1.5 million in unpaid percentage compensation. Turner acknowledged that it owed Wyler Summit $1.5 million in unpaid compensation but rejected Wyler Summit's demand, stating instead that it intended to continue to distribute the money in $50,000 annual installments pursuant to the installment payment provision of the 1958 contract.

When Turner refused to tender immediately the $1.5 million, Wyler Summit filed suit against Turner in federal court, invoking diversity jurisdiction. Among other claims, Wyler Summit alleged that once it waived the installment payment provision, Turner was in breach of contract by refusing to pay immediately all of the accrued but unpaid percentage compensation. Turner moved to dismiss the action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), and the district court granted Turner's motion.

Wyler Summit appealed to this court. *See Wyler I,* 135 F.3d 658. In that case, we held that the district court had properly dismissed all of Wyler Summit's claims, except one. *Id.* at 661. Reversing the district court, we concluded that Wyler Summit had adequately stated a claim for breach of contract and remanded the case. *Id.* at 664. The sole issue presented on remand was whether Wyler Summit had the right to waive the installment payment provision. *Id.* And, as we noted under California law, Wyler Summit had the right to waive the provision only if the contracting parties included it in the contract for the sole benefit of Mr. Wyler, not the mutual benefit of Mr. Wyler and MGM. *Id.*

On remand, Turner moved for summary judgment, asserting four grounds:

1) The constructive receipt doctrine precluded Wyler Summit from waiving the installment payment provision.

2) Wyler Summit was judicially estopped from waiving the provision.

3) Wyler Summit failed to create a genuine issue of material fact that the installment payment provision was included in the contract for the sole benefit of William Wyler, and therefore Wyler Summit could not waive the provision.

4) Even if Wyler Summit could waive the provision, laches provided an affirmative defense.

The district court granted Turner's motion on all four grounds, and Wyler Summit again appealed. We note that Turner has chosen not to defend two of the

ed and agreed to be granted to us as follows:
(a) The sum of Three Hundred and Fifty Thousand Dollars ($350,000) . . .
(b) We shall furthermore pay to you . . .

     \*    \*    \*    \*    \*    \*

  (ii.) An amount equal to three per cent (3%) of the gross receipts derived from the distribution and exhibition of said photoplay, in excess of Twenty Million Dollars ($20,000,000) of such gross receipts.

The compensation provided for in this subdivision (b) shall be referred to herein as your "percentage compensation" and shall be payable in annual installments not to exceed the sum of Fifty Thousand Dollars ($50,000) in any one year. . . .

grounds on which the district court based its decision—constructive receipt and judicial estoppel—even though Turner urged the district court to rule in its favor on those theories. We reject each of the district court's grounds in turn, and deny Wyler Summit's request to remand this case to a different district judge.

## II

### Constructive Receipt

The district court apparently determined that if the contract allowed Mr. Wyler to waive the installment payment provision, such a possibility might have resulted in constructive receipt by him of percentage compensation in excess of $50,000 annually. If the doctrine of constructive receipt would apply, then the Internal Revenue Service could have taxed Mr. Wyler on the entire amount of accrued percentage compensation held by MGM regardless of how much percentage compensation MGM actually distributed to him. The district court observed that "[w]aiver of the annual payment cap on percentage compensation would result in constructive receipt, negating William Wyler's original intent under the contract." Therefore, the court reasoned, the parties could not have intended to allow Mr. Wyler to waive the provision.

■ Even assuming that the district court's tax-law premise is sound, which is open to question, the court erred because it asked the wrong question. Under California law, the test of whether a contractual provision may be waived by one party is not whether the parties believed or assumed that it could be waived. Instead, the determinative inquiry is whether the provision was inserted for the sole benefit of one of the parties. *Wyler I*, 135 F.3d at 663 (citing *Sabo v. Fasano*, 154 Cal.App.3d 502, 201 Cal.Rptr. 270, 271 (Cal.Ct.App. 1984)). Therefore, whether Mr. Wyler's right to waive the installment payment provision might have triggered the constructive receipt doctrine is irrelevant.

The only relevant question is whether the contracting parties included the installment payment provision for the sole benefit of Mr. Wyler. *Id.*

## III

### Judicial Estoppel

■ The district court then concluded as an apparent follow-up to its ruling on constructive receipt, that because Mr. Wyler claimed only $50,000 per year in percentage compensation when declaring his taxable income to the I.R.S., he was judicially estopped from claiming the right to waive the provision. "Judicial estoppel applies when a party's position is 'tantamount to a knowing misrepresentation to or even fraud on the court.'" *Johnson v. State of Oregon*, 141 F.3d 1361, 1369 (9th Cir.1998) (quoting *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 362–63 (3d Cir.1996)). If a litigant's current position is manifestly inconsistent with a prior position such as to "amount to an affront to the court, judicial estoppel may apply." *Id.* The district court's use of judicial estoppel in this case was not appropriate.

■ The doctrine of judicial estoppel requires, *inter alia*, a knowing antecedent misrepresentation by the person or party alleged to be estopped and prevents the party from tendering a contradictory assertion to a court. *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir.1990). Here, the fact that Mr. Wyler claimed to the I.R.S. $50,000 in percentage compensation annually on his taxes was not a misrepresentation; he actually received only $50,000 per year. And, as explained above, the fact that Mr. Wyler claimed $50,000 in percentage compensation on his taxes does not necessarily contradict Wyler Summit's current claim that the installment payment provision was included in the contract for the sole benefit of Mr. Wyler, and that it can now be waived. The record does not contain any evidence that Mr. Wyler ever told the I.R.S. in connection with his taxes

that the installment payment provision was not subject to waiver. Moreover, as far as the contract is concerned, the waiver operates prospectively, not retroactively.

## IV

## Who Was Intended to Benefit from the Installment Payment Provision?

■ The district court held, as a matter of law, that the installment payment provision was included in the contract for the mutual benefit of Mr. Wyler and MGM, not for the sole benefit of Mr. Wyler. Accordingly, Wyler Summit was precluded from waiving the installment payment provision.

We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact for trial and whether the district court correctly applied the substantive law. *Robi v. Reed*, 173 F.3d 736, 739 (9th Cir.1999). Our *de novo* review of the evidence presented convinces us that the district court erred in granting summary judgment in favor of Turner.

Only if the installment payment provision was included in the contract for the *sole* benefit of Mr. Wyler can Wyler Summit waive the provision. *Sabo*, 201 Cal. Rptr. at 271. Thus, to survive summary judgment Wyler Summit must introduce evidence that creates a genuine issue of material fact that: (1) the provision was included for the benefit of Mr. Wyler; and (2) the provision was not included for the benefit of MGM. We conclude that Wyler Summit satisfied its burden.

The first element is undisputed. The installment payment provision was included in the 1958 contract, at least in part, to limit Mr. Wyler's tax liability under the high marginal tax rates then in effect, and also to provide a steady stream of income to the Wyler family. These purposes undoubtedly inured to Mr. Wyler's financial benefit.

The second element is contested. Turner emphasizes that MGM actually received a benefit from the installment payment provision: to the extent that percentage compensation exceeded $50,000 annually, MGM received interest-free capital. The use of interest-free capital, Turner contends, is an obvious benefit to MGM, and therefore Wyler Summit failed to prove that the installment payment provision was not inserted into the 1958 contract partly for MGM's benefit.

Unquestionably, MGM and Turner have reaped a financial benefit from the installment payment provision in the form of interest-free capital. However, as we explained in *Wyler I*: "Although potentially probative of the parties' intent, the fact that the installment payment provision *presently* benefits, or has benefitted, MGM and/or Turner is not, *ipso facto*, determinative of the relevant inquiry in this case—whether said provision was *originally* (i.e., in 1958) included in the contract solely for Wyler's benefit." *Wyler I*, 135 F.3d at 663 (emphases in original). In other words, the fact that MGM and Turner have benefitted from the use of interest-free capital as a by-product of the provision does not, by itself, justify summary judgment against Wyler Summit.

Wyler Summit has presented evidence that, when viewed in the light most favorable to it, would prove that the installment payment provision was not included for the benefit of MGM. First, Wyler Summit offered the testimony of Leon Kaplan, a member of Mr. Wyler's negotiation team in 1958. With respect to the *Ben Hur* contract, Kaplan testified at deposition that it was Mr. Wyler's lawyers who requested the installment payment provision during negotiations. Kaplan also testified that "there was no discussion at all" concerning a benefit flowing to MGM from the provision. And, when asked if studios generally agreed to installment payment provisions because they realized a benefit from them, Kaplan answered: "I don't think so. I think it all came from [the]

talent [side]." As explained above, Kaplan's acknowledgment that MGM actually received the interest-free use of the unpaid percentage compensation does not cancel out his testimony as to the genesis of the provision.

Wyler Summit also offered a declaration from Roger Davis. Based on four decades of experience in the entertainment industry, including representing MGM, Davis opined that the installment payment provision was not included in the contract for MGM's benefit.

While the foregoing evidence, by itself, when viewed in a light most favorable to Wyler Summit, would be enough to create at least a genuine issue of material fact, Wyler Summit also offered the declarations of tax consultants Everett Harry and Burton Forester. Harry stated that he "performed a series of analyses to assess the economic effect of the [installment payment] provision on MGM." Based on these analyses, it was his opinion that "at the time the contract was drafted, MGM could not reasonably have expected to derive any meaningful benefit from the installment payment provision and that the provision could very well have been expected to have an adverse impact on MGM." Forester stated that because of the corporate tax climate in 1958, MGM was likely to incur a tax detriment by agreeing to the installment payment provision. A transitional clause already in the tax code in 1958 indicated that the corporate tax rate would decline from 52% to 47% within the next few years. MGM would have to pay taxes on percentage compensation when it was earned at the 52% rate, but it could claim an offsetting deduction only when the percentage compensation was distributed to Wyler at the lower 47% rate. Thus, by deferring payment to a future year, in which the tax rate was scheduled to drop, MGM probably anticipated a tax loss.

Turner offered its own expert, Lawrence Stone, who declared that the opinions of Forester and Harry are flawed because studios did not deduct percentage compensation payments when paid out, but rather depreciated them over time as capital expenditures. Based on Stone's interpretation of the state of tax law in 1958, Turner contends that Forester's and Harry's declarations fail as a matter of law.

It is true that the testimony of an expert fails to create a genuine issue of material fact when "the expert offers an opinion that *courts* have rejected as a matter of law." *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 146 F.3d 1088, 1095 (9th Cir.1998) (emphasis added). Here, though, it is *Turner's expert*, not a court, who rejects the opinions of Forester and Harry. Weighing the credibility of conflicting expert witness testimony is the province of the jury. See *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1144 (9th Cir.1997).

In an attempt to demonstrate the absence of any material fact in dispute, Turner submitted in the motion the affidavits of four alleged entertainment industry experts who, like everyone except Leon Kaplan, had no connection with the negotiations of the *Ben Hur* contract. Wyler Summit objected to much of this material. Taking them at face value, however, the affidavits are insufficient to accomplish their summary judgment objective. We conclude, therefore, that Wyler Summit presented sufficient evidence to raise a triable issue of fact as to whether MGM and Mr. Wyler included the installment payment provision in the 1958 contract for the sole benefit of Mr. Wyler.

## V

### Laches

As an alternative ground for granting summary judgment, the district court held that even if Wyler Summit could waive the installment payment provision, it was barred from doing so based on laches. Wyler Summit argues that laches is unavailable as a defense for two reasons: (1) the "law of the case" precludes Turner

from asserting laches as a defense; and (2) because its claim sounds at law, the equitable defense of laches cannot apply. Wyler Summit is mistaken with respect to its law of the case argument, but is correct that its claim sounds at law, and therefore the equitable defense of laches is unavailable to Turner.

### 1. Law of the Case

■ Under the law of the case doctrine, "the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case." *Jeffries v. Wood,* 114 F.3d 1484, 1489 (9th Cir.1997) (quoting *In re Rainbow Magazine, Inc.,* 77 F.3d 278, 281 (9th Cir.1996)). "For the doctrine [of law of the case] to apply, the issue in question must have been decided explicitly or by necessary implication in [the] previous disposition." *Rebel Oil,* 146 F.3d at 1093 (quoting *Milgard Tempering, Inc. v. Selas Corp.,* 902 F.2d 703, 715 (9th Cir.1990)).

■ Wyler Summit first argues that *Wyler I* definitively established that its claim seeking money recovery for Turner's alleged breach of contract was an action at law, not in equity, and therefore laches was not available as a defense. Then, Wyler Summit contends that *Wyler I* conclusively decided that, for purposes of Turner's laches defense, Wyler Summit's claim accrued in 1995, and therefore, the district court's finding that Wyler Summit had delayed thirty-eight years in bringing suit contradicted our previous holding. *Wyler I,* 135 F.3d at 664.

Wyler Summit misreads our previous decision on both counts. *Wyler I* concerned the issue of whether Wyler Summit stated a claim for relief sufficient to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Id.* at 661. We were not asked to, and did not, analyze whether Wyler Summit's claim for breach of contract sounded in equity or at law, as we would have been required to do if, for example, the issue was a party's right to a jury trial. *See De Guere v.*

*Universal City Studios, Inc.,* 56 Cal. App.4th 482, 65 Cal.Rptr.2d 438, 454 (Cal. Ct.App.1997). Nor did we address any time frame with respect to laches. Rather, when we stated that Wyler Summit's claim accrued in 1995, we were referring specifically to a statute of limitations period, not laches. *See Wyler I,* 135 F.3d at 664 ("the four year [statute of] ... limitations period began to run" in 1995).

Because *Wyler I* did not decide directly or by necessary implication the legal or equitable nature of Wyler Summit's claim or when a possible period for laches actually accrued, we conclude that the district court did not contradict the law of the case when it permitted Turner to assert laches as a defense. *See Rebel Oil,* 146 F.3d at 1093.

### 2. Claim at Law or Claim in Equity

The district court concluded not only that laches was available to Turner as a defense, but also that the defense, as a matter of law, applied in this case. Because we determine that laches is not available as a defense to Wyler Summit's claim for breach of contract seeking money damages, we do not address the district court's determination that laches (if available) would bar Wyler Summit's claim.

■ A district court's determination as to whether laches may be a defense to a particular cause of action is a question of law subject to *de novo* review. *Jackson v. Axton,* 25 F.3d 884, 886 (9th Cir.1994). Under California law, laches is available as a defense only to claims sounding in equity, not to claims at law. *Wells Fargo Bank, N.A. v. Bank of America NT & SA,* 32 Cal.App.4th 424, 38 Cal.Rptr.2d 521, 530 (Cal.Ct.App.1995). Thus, only if Wyler Summit's claim sounds in equity can Turner assert laches as a defense. We hold that Wyler Summit's claim is legal, and consequently laches is not available as a defense.

The legal or equitable nature of a cause of action is ordinarily determined by the remedy sought. *See Raedeke v. Gibraltar Savings & Loan Ass'n,* 10 Cal.3d 665, 111 Cal.Rptr. 693, 517 P.2d 1157, 1160 (Cal.1974). Wyler Summit's complaint requests monetary relief for Turner's alleged breach of contract. In most instances, a claim seeking money damages for breach of contract is an action at law. *See Wells Fargo Bank,* 38 Cal. Rptr.2d at 530.

Turner correctly points out, however, that Wyler Summit's cause of action for breach of contract depends entirely on whether Wyler Summit can waive the installment payment provision. Because waiver is an equitable doctrine, Turner argues, the "gist" of Wyler Summit's claim is equitable.

Initially, Turner points to some 19th century California cases involving issues of waiver, and argues that because those cases were tried in courts of equity, any time a plaintiff relies on waiver as a basis for relief, the action must be equitable. The problem with Turner's argument is that the cases it identifies sought specific performance, as opposed to money damages. *See Cooper v. Pena,* 21 Cal. 403, 411, 1863 WL 493 (Cal.1863) ("This is an action to *compel* the defendant to convey to the plaintiff a tract of land . . . .") (emphasis added); *Farley v. Vaughn,* 11 Cal. 227, 233, 1858 WL 735 (Cal.1858) ("This was a bill filed for a *specific performance* of a contract for the sale of certain real estate") (emphasis added). Specific performance of a real estate contract unquestionably is an equitable remedy.

The fact that Wyler Summit seeks money damages, as opposed to specific performance, does not, by itself, render its action one at law. But, as stated above, the legal or equitable nature of a cause of action is ordinarily determined by the remedy sought. *See Raedeke,* 111 Cal.Rptr. 693, 517 P.2d at 1160. That the plaintiffs in *Farley* and *Pena* sought specific performance of a real estate contract is sufficient

to distinguish those cases from the case at bar.

Moreover, Turner's argument overlooks a critical distinction. On one hand is the situation where a plaintiff seeks a legal remedy requiring the application of equitable principles to determine if relief is justified. On the other hand is the situation where a plaintiff requests legal redress but states a cause of action cognizable only in courts of equity. The former circumstance sounds at law; the latter in equity.

Ironically, the cases Turner cited in its brief and at oral argument illustrate this distinction. In *De Guere v. Universal City Studios, Inc.,* a television producer sued Universal City Studios ("Universal") for breach of contract requesting money damages. 65 Cal.Rptr.2d at 454. A provision in the contract entitled De Guere to a percentage compensation of net profits from a show he produced for Universal. *Id.* at 455. Universal claimed the show turned no profit and refused to pay De Guere anything. *Id.* De Guere maintained Universal's improper accounting methods led the studio to claim the show had made no profit. *Id.* De Guere demanded a jury trial. *Id.* Under California law, he was entitled to a jury trial only if his claim sounded at law, not in equity. *Id.*

Despite De Guere's request for money damages, the court deemed the claim to be equitable and denied De Guere a jury trial. *Id.* at 453–55. The court reasoned that because De Guere challenged Universal's accounting methods, he really sought an equitable accounting. *Id.* at 454. Even though De Guere labeled his claim as one seeking money damages for breach of contract, he actually sought relief that was cognizable in a court of equity. *Id.*

Similarly, in *C & K Engineering Contractors v. Amber Steel Co.,* a general contractor sued a subcontractor for breach of contract seeking money damages. 23 Cal.3d 1, 151 Cal.Rptr. 323, 587 P.2d 1136 (Cal.1978) ("*C & K Engineering*"). C & K

Engineering had solicited bids from various contractors, and Amber Steel's bid was by far the lowest. *Id.* at 1137. Cognizant of a possible mistake in the bid, C & K Engineering then called Amber Steel to confirm the low bid, and Amber Steel made a "verbal promise" that the work would be performed at the bid price. *Id.* at 1138. When Amber Steel subsequently refused to perform, C & K Engineering was forced to hire another subcontractor. *Id.* at 1138. C & K Engineering claimed that it had reasonably relied on Amber Steel's verbal promise to perform the work for the bid price, and brought an action for breach of contract seeking money damages. *Id.* Amber Steel demanded a jury trial, arguing that because C & K Engineering sued to recover money damages for a breach of contract, the case necessarily sounded at law. *Id.*

The Supreme Court of California disagreed. *Id.* at 1139–41. In spite of C & K Engineering's characterization of its claim as one for breach of contract, the court observed that "[i]t is undisputed that plaintiff's complaint in the matter ... relies exclusively upon the doctrine [of promissory estoppel] to enforce defendant's alleged promise to perform its bid." *Id.* at 1138. The doctrine of promissory estoppel was "developed to provide a remedy (namely, enforcement of a gratuitous promise) which was not generally available in courts of law prior to 1850." *Id.* at 1139. Therefore, C & K Engineering did not sue for breach of contract at all; rather, it sued for equitable relief under the doctrine of promissory estoppel. *See id.; see also Jaffe v. Albertson Co.*, 243 Cal.App.2d 592, 53 Cal.Rptr. 25, 30 (Cal.Ct.App.1966) (finding Jaffee's suit to be in equity because complaint alleged breach of contract based on an "oral contract" and an "oral promise"); *Ford v. Palisades Corp.*, 101 Cal. App.2d 491, 225 P.2d 545, 546 (Cal.Ct.App. 1950) (finding Ford's suit to be in equity because "[t]he complaint alleged that the period of employment was extended by oral agreement and that the facts which

plaintiff claims estop defendant from invoking the statute of frauds").

■■■ This case is demonstrably different from both *De Guere* and *C & K Engineering.* If, for example, Wyler Summit had complained about the accounting practices Turner used to calculate the percentage compensation, then its action might be one seeking an equitable accounting. *See De Guere*, 65 Cal.Rptr.2d at 454. Similarly, if Wyler Summit was relying on Turner's verbal promise to immediately pay the accrued but unpaid percentage compensation, then its action might be one seeking relief that was available only in courts of equity. *See C & K Engineering*, 151 Cal.Rptr. 323, 587 P.2d at 1139–41.

But, Wyler Summit argues that Turner breached the written contract by refusing to pay on demand the accrued percentage compensation after Wyler Summit attempted to waive the installment payment provision. Unlike De Guere, Wyler Summit actually seeks legal relief, not an equitable accounting. And, unlike C & K Engineering, Wyler Summit is not relying on promissory estoppel, a cause of action only cognizable in equity, as a basis for relief. The fact that the court must apply the equitable doctrine of waiver in deciding whether to grant Wyler Summit relief is incidental. Simply because "equitable principles are ... used to establish the alleged liability of the defendants, it does not necessarily follow that the action to enforce that liability is equitable." *Martin v. County of Los Angeles*, 51 Cal.App.4th 688, 59 Cal.Rptr.2d 303, 306 (Cal.Ct.App. 1996) (citation omitted).

Because Wyler Summit actually seeks a remedy cognizable in courts of law, its claim is legal. Accordingly, Turner cannot assert laches as a defense. *Wells Fargo Bank*, 38 Cal.Rptr.2d at 530.

## VI

### Remand to a Different Judge

Because we conclude that summary judgment was improper, we must remand

the case to the district court. Wyler Summit asks us to remand the case to a different district court judge. We decline the invitation.

We have both the statutory authorization, *see* 28 U.S.C. § 2106, and the inherent authority to remand the case to a different district court judge. *See United Nat'l Ins. Co. v. R & D Latex Corp.,* 141 F.3d 916, 920 (9th Cir.1998). However, appellate courts are reluctant to remand a case to a different district court judge absent "unusual circumstances." *See United States v. Robin,* 553 F.2d 8, 10 (2d Cir.1977).

In determining whether "unusual circumstances" exist, the court considers: (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*See United Nat'l Ins. Co.,* 141 F.3d at 920.

This case does not present such unusual circumstances that we must remand the case to a different district judge. Wyler Summit initially brought suit against Turner alleging numerous causes of action. Judge Armstrong dismissed all of Wyler Summit's claims. On appeal, all but one of Judge Armstrong's rulings were upheld, *see Wyler I,* 135 F.3d at 661, and the one ground rejected garnered a vigorous dissent. *See id.* at 664–67 (Tashima, J., dissenting).

On remand, Judge Armstrong granted summary judgment in favor of Turner based on arguments that had not been previously made. Admittedly, Judge Armstrong adopted verbatim Turner's proposed order granting summary judgment. We have frowned upon the practice of adopting counsel's proposed orders verbatim because it raises the possibility that there was insufficient independent evaluation of the evidence and may cause the losing party to believe that its position has not been given the consideration it deserves. *See Vuitton et Fils S.A. v. J. Young Enterprises,* 644 F.2d 769, 778 (9th Cir.1981); *Photo Electronics Corp. v. England,* 581 F.2d 772, 776–77 (9th Cir.1978). Moreover, the order prepared by Turner's lawyers is conclusionary to a fault, lacks sufficient analysis, and is flatly wrong in proclaiming that the key issue in dispute was actually "undisputed." This is simply not so. By itself, however, adopting a party's proposed order does not compel remanding the case to a different judge. *See Vuitton et Fils S.A.,* 644 F.2d at 778.

The record, as a whole, does not demonstrate the type of "unusual circumstances" that require us to remand the case to a different district judge. However, if on remand Judge Armstrong believes her "impartiality might reasonably be questioned," we trust that she will exercise her good judgment accordingly. *See* 28 U.S.C. § 455.

## VII

### Conclusion

For the reasons stated above, we REVERSE and REMAND the case to the district court.